

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00351-CV

**CITY OF SAN ANTONIO**; San Antonio Police Department; Joe Vidal, Individually and in His Official Capacity; and Daniel Moynihan, Individually and in His Official Capacity, Appellants

v.

Jimmy **MARTIN**, GGL Vendor Leasing LLC, and JLM Games, Inc., Appellees

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2022-CI-09481
Honorable Elizabeth Martinez, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Irene Rios, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: May 27, 2026

REVERSED AND RENDERED

Appellants the City of San Antonio, Joe Vidal in his official capacity, and Daniel Moynihan in his official capacity (collectively, "the governmental appellants")[1] appeal the trial court's denial

---

[1] The notice of appeal and the parties' briefs list the appellants as the City of San Antonio, the San Antonio Police Department ("SAPD"), Joe Vidal individually and in his official capacity, and Daniel Moynihan individually and in his official capacity. However, the claims against SAPD, Vidal in his individual capacity, and Moynihan in his individual capacity were nonsuited below. The City, Vidal in his official capacity, and Moynihan in his official capacity are the only appellants with claims currently pending against them below.

of their motion for summary judgment on governmental immunity grounds. We reverse the trial court's order and render judgment dismissing the claims against the governmental appellants.

## LEGAL BACKGROUND

Appellee Jimmy Martin is the owner and sole shareholder of appellees GGL Leasing LLC and JLM Games, Inc. The appellees (collectively, "the Martin parties") develop, build, operate, and lease machines referred to as eight-liners. These machines:

> generally operate like a video slot machine: a patron pays to play the machine, which displays nine electronic symbols arranged in three columns and three rows; the machine records the payment as credits; and the player bets some or all of those credits by pushing a button to cause the three columns to start spinning. If the columns stop (either automatically or when the player pushes the button a second time) with three of the same symbols in one of eight possible lines—three vertical, three horizontal, and two diagonal—the player wins a predetermined amount of additional credits.

*City of Fort Worth v. Rylie*, 602 S.W.3d 459, 462 (Tex. 2020) ("*Rylie I*").

The Texas Constitution requires the legislature to "pass laws prohibiting lotteries and gift enterprises" other than those specifically authorized by the constitution. TEX. CONST. art. III, § 47(a). The Texas Penal Code defines "lottery" as "any scheme or procedure whereby one or more prizes are distributed by chance among persons who have paid or promised consideration for a chance to win anything of value[.]" TEX. PENAL CODE § 47.01(7). "The tripartite view of what constitutes a lottery—chance, prize, and consideration—is ubiquitous." *City of Fort Worth v. Rylie*, 649 S.W.3d 246, 250 (Tex. App.—Fort Worth 2022, pet. denied) (*Rylie II*).

Chapter 47 of the Texas Penal Code prohibits most forms of gambling, including wagers conducted on "gambling devices" such as video poker and slot machines. TEX. PENAL CODE § 47.01(4) (defining gambling device), §§ 47.02–.06 (describing gambling offenses). However, chapter 47 further provides that the term gambling device:

does not include any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.

*Id.* § 47.01(4)(B). The Texas Legislature promulgated section 47.01(4)(B) to exempt "family entertainment centers" like Dave & Buster's and Chuck E. Cheese from the constitution's general prohibition against gambling. *See Rylie I*, 602 S.W.3d at 461–62. Section 47.01(4)(B) has therefore "become known as the 'fuzzy-animal exclusion.'" *See id.*

The Martin parties contend that their eight-liners fall within the fuzzy-animal exclusion because: (1) they program the machines to avoid any payouts beyond what is allowed by the fuzzy-animal exclusion; and (2) the gaming rooms in which their eight-liners are used pay customers in silver, not cash. The governmental appellants disagree and argue that the Martin parties' eight-liners are illegal gambling devices.

Eight-liners have generated a significant amount of litigation in Texas courts, primarily in the context of civil forfeiture cases conducted under article 18.18 of the Code of Criminal Procedure. *See State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 178 (Tex. 2013) (per curiam); *Hardy v. State*, 102 S.W.3d 123, 124–25 (Tex. 2003); *State v. One Super Cherry Master Video 8-Liner Machine*, 102 S.W.3d 132, 133 (Tex. 2003). In several non-forfeiture cases involving eight-liners, both this court and our sister courts have held that a civil trial court lacked jurisdiction to construe section 47.01(4)(B) of the Texas Penal Code or enjoin its enforcement in cases where the statute's validity has not been challenged. *See Sterling v. San Antonio Police Dep't*, 94 S.W.3d 790, 793–95 (Tex. App.—San Antonio 2002, no pet.); *Cameron Cnty. Dist. Att'y v. JLM Games, Inc.*, No. 13-17-00653-CV, 2019 WL 5997504, at *1–4 (Tex. App.—Corpus Christi–Edinburg

Nov. 4, 2019, pet. denied) (mem. op.); *Cornyn v. Akin*, 50 S.W.3d 735, 735–38 (Tex. App.—El Paso 2001, no pet.); *City of Longview v. Head*, 33 S.W.3d 47, 50–54 (Tex. App.—Tyler 2000, no pet.); *Warren v. Aldridge*, 992 S.W.2d 689, 691 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *cf. Rylie II*, 649 S.W.3d at 247–48 (considering competing claims about the validity of city ordinances regarding gambling and the constitutionality of the fuzzy-animal exclusion). One of those cases involved claims brought by the Martin parties. *See JLM Games*, 2019 WL 5997504, at *1–4.

### FACTUAL BACKGROUND

Vidal and Moynihan are vice detectives with SAPD; the City is their employer. Between 2016 and 2022, Vidal and Moynihan obtained and executed search warrants on five San Antonio gaming rooms that contained the Martin parties' eight-liners.[2] Jimmy Martin operated some of the gaming rooms, while others were operated by third parties who leased machines from the Martin parties. Each of the gaming rooms was located near (usually next door to) businesses where customers could exchange their silver winnings for cash. The Martin parties allege that while SAPD officers were executing the warrants, they seized and/or destroyed eight-liners, circuit boards, ATMs, cash, and silver trinkets. The Martin parties further allege that they lost commercial leases and other contracts because Vidal and Moynihan contacted third-party landlords and vendees and informed them about the criminal investigations.

The record does not show that the Martin parties challenged any of the search warrants, and Jimmy Martin agreed in his deposition that all the seized and/or destroyed property was within

---

[2] The Martin parties' live petition identifies six gaming rooms where their machines were located. However, one of those gaming rooms was located in Universal City, not San Antonio. Martin testified that the Universal City location "has never been raided" and that he did not seek any damages or recovery for property located there.

the scope of the warrants.[3] Multiple criminal charges related to the Martin parties' eight-liners—some against Jimmy Martin, and some against his employees and vendees—have been dismissed. Two criminal charges against Jimmy Martin were dismissed for "interest of justice" without further explanation. Some charges against individuals who are not parties to this appeal were conditionally dismissed based on an agreement to forfeit gambling proceeds, while others were dismissed with notations of "interest of justice," "further investigation," "insufficient evidence/motion to suppress granted," or "missing witness." In at least one case against a non-party, some of the seized property was returned to that individual.

On May 20, 2022, the Martin parties sued the State of Texas, the City, SAPD, Vidal, and Moynihan. The Martin parties' claims against the State of Texas are not at issue in this appeal. In their petition, the Martin parties alleged that the destruction and seizure of property that occurred during the execution of the search warrants was an unconstitutional taking for which the City lacked governmental immunity. They also alleged that Vidal and Moynihan tortiously interfered with the Martin parties' contracts with landlords and vendees and thus committed ultra vires acts for which they lacked governmental immunity. The Martin parties sought declarations under the Uniform Declaratory Judgments Act ("UDJA") that:

1) "Plaintiffs are acting in accordance with Texas Penal Code § 47.01(4)(B)" (*i.e.*, that the Martin parties' machines fall within the fuzzy-animal exclusion);

2) the City, SAPD, Vidal, and Moynihan "violat[ed] Plaintiffs' constitutional rights by damaging and confiscating property that Plaintiffs are not prohibited from using or owning" and took "property without just compensation through wrongful seizures"; and

3) Vidal and Moynihan "acted outside the scope and authority of their offices in harassing Plaintiffs by unilaterally initiating investigations and SAPD raids with Plaintiffs' amusement machines and misrepresenting their investigations to others involved with

---

[3] In their post-submission briefing, the Martin parties suggested the warrants did not "authorize the seizure of cash that was not proceeds from the commission of an offense." Neither their trial court pleadings nor their original briefing alleged that the officers seized cash that was outside the scope of the warrants, and their post-submission briefing did not identify any specific amounts that they contend were excluded from the scope of the warrants.

Plaintiffs' amusement machine operations, and that such unlawful acts have interfered with Plaintiffs' businesses and contracts related thereto[.]"

The Martin parties' petition additionally sought compensatory and exemplary damages, attorney's fees under the UDJA, and injunctive relief. They specifically sought orders that: (1) directed the return of the seized property; (2) provided that "Plaintiffs are allowed to re-open their businesses at locations in San Antonio"; and (3) enjoined the City and SAPD "from seizing Plaintiffs' property or shutting down Plaintiffs' businesses so long as Plaintiffs act in accordance with Texas Penal Code § 47.01(4)(B)."

On March 24, 2025, the governmental appellants filed a traditional and no-evidence motion for summary judgment. The motion argued:

1) SAPD "has no separate legal existence from" the City and cannot be sued in its own right;

2) the statute of limitations bars any tortious interference or takings claim arising out of the first four warrants, which were all executed more than two years before the Martin parties filed their lawsuit;

3) the Martin parties cannot establish a viable takings claim against the City and that claim is therefore barred by governmental immunity;

4) the Martin parties' ultra vires/tortious interference claim against Vidal and Moynihan fails as a matter of law—and Vidal and Moynihan are thus entitled to rely on the City's immunity—because: (a) the Martin parties are seeking to remedy past harms that cannot be addressed by an ultra vires claim; and (b) there is no evidence that Vidal and Moynihan exceeded the bounds of their granted authority and/or the evidence conclusively establishes they did not;

5) the Martin parties' request for declaratory relief fails as a matter of law because a civil court lacks jurisdiction to construe penal statutes under these circumstances; and

6) the Martin parties' requests for compensatory and exemplary damages, attorney's fees, and injunctive relief fail alongside their substantive claims.

The motion for summary judgment also raised immunity arguments based on official immunity and section 101.106 of the Texas Tort Claims Act, but the governmental appellants abandoned those arguments on appeal. Finally, both the motion for summary judgment and the governmental

appellants' briefing in this court argued that the fuzzy-animal exclusion is unconstitutional. However, the governmental appellants did not file a counterpetition asserting that claim.

The Martin parties filed a written response to the motion for summary judgment, and the governmental appellants filed a reply. After the trial court heard the motion, both sides filed supplemental briefing on the summary judgment issues. The Martin parties subsequently nonsuited "any and all claims against" SAPD and against Vidal and Moynihan in their individual capacity, the tortious interference claim as to the City, and the takings claim as to Vidal and Moynihan.

On May 28, 2025, the trial court signed an order granting the nonsuit and a separate order denying the governmental appellants' motion for summary judgment as to the remaining claims. The governmental appellants then timely filed this interlocutory appeal.

## ANALYSIS

The live claims before this court are a takings claim against the City, a declaratory judgment action, and an ultra vires claim against Vidal and Moynihan. We will examine each in turn.

### *Standard of Review*

A governmental entity may assert immunity from suit through a motion for summary judgment. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). This court reviews a trial court's ruling on a jurisdictional plea de novo. *City of San Antonio v. Summerglen Prop. Owners Ass'n Inc.*, 185 S.W.3d 74, 83 (Tex. App.—San Antonio 2005, pet. denied) (per curiam). When a jurisdictional plea challenges the plaintiff's pleadings, we must determine "if the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case." *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 486 (Tex. 2018). If the pleaded facts do not affirmatively demonstrate the trial court's jurisdiction but also do not reveal incurable

jurisdictional defects, the plaintiff should be allowed to amend. *Id.* However, "if the pleadings affirmatively negate the existence of jurisdiction, such that it is impossible to amend the pleadings to invoke jurisdiction, the plea may be granted and the suit dismissed without allowing the plaintiffs an opportunity to amend." *Id.*

When a jurisdictional plea implicates the merits of the parties' claims, "we consider the relevant evidence submitted by the parties to determine if a fact issue exists." *Millspaugh v. Bulverde Spring Branch Emergency Servs.*, 559 S.W.3d 613, 618 (Tex. App.—San Antonio 2018, no pet.). If the evidence is undisputed or does not raise a fact question, the trial court rules on the plea as a matter of law. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). However, if the evidence raises a fact question on the jurisdictional issue, "then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227–28.

### *Appellate Jurisdiction*

In their appellate briefing, the Martin parties contend that the governmental appellants brought their interlocutory appeal solely under Texas Civil Practice and Remedies Code section 51.014(a)(5). They argue that our review is therefore limited to whether Vidal and Moynihan had official immunity for their challenged actions.

We disagree. Because we have a duty to examine our own jurisdiction, *see M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004) (per curiam), the statutory citations in an appellant's notice of appeal are not necessarily dispositive. Here, however, the governmental appellants' notice of appeal invoked this court's jurisdiction under Texas Civil Practice and Remedies Code section 51.014(a)(5) *and* section 51.014(a)(8). *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(5), (a)(8); *Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 845–46 (Tex. 2007) (interpreting

interlocutory jurisdiction under sections 51.014(a)(5) and (a)(8)); *Suarez v. Silvas*, No. 04-21-00113-CV, 2022 WL 379965, at *3–4 (Tex. App.—San Antonio Feb. 9, 2022, no pet.) (mem. op.) (exercising interlocutory jurisdiction over governmental employees' immunity claim under section 51.014(a)(5)). Section 51.014(a)(5) permits interlocutory review of an order that "denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state," and section 51.014(a)(8) allows interlocutory review of an order that "grants or denies a plea to the jurisdiction by a governmental unit[.]" TEX. CIV. PRAC. & REM. CODE § 51.014(a)(5), (a)(8).

This case falls into both categories. The governmental appellants' motion for summary judgment argued that the City and its employees, Vidal and Moynihan, were immune from suit for various reasons. *See Miranda*, 133 S.W.3d at 225–26 ("Sovereign immunity from suit defeats a trial court's subject matter jurisdiction[.] . . . The trial court must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed."). Those arguments are consistent with both the statutes under which they seek interlocutory review and their appellate briefing. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(5), (a)(8). We have interlocutory jurisdiction to consider whether the trial court erred by rejecting the governmental appellants' claims that they are immune from suit.

### *The Martin Parties' Standing*

The governmental appellants argue that none of the Martin parties have standing to assert a takings claim because Jimmy Martin purportedly failed to identify who owns the eight-liners. However, the Martin parties' summary judgment response asserted that GGL owned the machines and leased them to third parties. Additionally, the evidence presented by both sides included Jimmy Martin's testimony that GGL leased the machines to third parties. When viewed in the light

most favorable to the Martin parties, this is more than a scintilla of evidence that GGL had an ownership interest in the machines and thus had a justiciable interest in their disposition. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *see also Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005) (defining standing). Accordingly, it was sufficient to raise a genuine issue of material fact on the Martin parties' standing and preclude summary judgment on that issue. *See Miranda*, 133 S.W.3d at 227–28.

### The Trial Court's Jurisdiction Over the Martin Parties' Claims

*Takings*

A. Applicable Law

The Texas Constitution provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made[.]" TEX. CONST. art. I, § 17(a); *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012). Where, as here, a plaintiff seeks after-the-fact relief for property that has already been involuntarily seized or destroyed, the claim is for inverse condemnation. *See San Jacinto River Auth. v. Burney*, 570 S.W.3d 820, 826 (Tex. App.—Houston [1st Dist.] 2018), *aff'd sub nom.*, *San Jacinto River Auth. v. Medina*, 627 S.W.3d 618 (Tex. 2021). "To plead a valid inverse condemnation claim, the plaintiff must allege that (1) the governmental entity intentionally performed certain acts in the exercise of its lawful authority (2) that resulted in a 'taking' of property (3) for public use." *Hammons v. City of Krugerville*, No. 02-04-00353-CV, 2005 WL 2838602, at *3 (Tex. App.—Fort Worth Oct. 27, 2005, pet. denied) (mem. op.).

Article I, section 17 of the Texas Constitution waives immunity for a takings claim without the necessity of a separate statutory waiver. *See Chambers v. State*, No. 05-12-01178-CV, 2013 WL 4568380, at *2 (Tex. App.—Dallas Aug. 26, 2013, pet. denied) (mem. op.). Nevertheless, "[a]

trial court lacks jurisdiction and should grant a plea to the jurisdiction where a plaintiff 'cannot establish a viable takings claim.'" *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013) (quoting *Hearts Bluff*, 381 S.W.3d at 491); *Kaufman County v. Combs*, 393 S.W.3d 336, 345 (Tex. App.—Dallas 2012, pet. denied) ("Although governmental immunity does not shield a governmental entity from a valid takings claim, it does apply when a plaintiff does not allege a valid takings claim."). If there is no evidence of a required element of a takings claim or if the evidence conclusively disproves a required element, the governmental defendant retains its immunity from suit. *See Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 26 (Tex. 2024). "[T]he ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." *Mayhew v. Town of Sunnydale*, 964 S.W.2d 922, 933 (Tex. 1998).

B. <u>Application</u>

For multiple reasons, we hold the trial court erred by denying the City's motion for summary judgment on the takings claim.

First, it is undisputed that all the property at issue was taken or destroyed during the execution of valid search warrants issued by a magistrate. As noted above, the Martin parties never challenged the validity of those search warrants.[4] This court has previously held that when property is "seized pursuant to the criminal laws or subjected to in rem forfeiture proceedings, such deprivations are not 'takings' for which the owner is entitled to compensation." *Garcia v. State*, 327 S.W.3d 243, 250 (Tex. App.—San Antonio 2010, no pet.) (internal quotation marks omitted).

---

[4] During oral argument, the Martin parties represented that the warrants were "suppressed." In their post-submission briefing, they argue that before some of the searches occurred, "a court had found that the machines were legal." These assertions appear to be based solely on evidence showing that in 2019, a judge dismissed a criminal charge against one of the Martin parties' vendees, Sylvia Ramos Gonzalez, after finding "there was no probable cause in [that] case." Gonzalez is not a party to this civil case, and the Martin parties did not present any evidence or authority showing that the Gonzalez dismissal amounted to a suppression of the multiple search warrants at issue here. Furthermore, because this civil case is not an appeal from a criminal court's ruling on a motion to suppress, we decline to engage in "secondary appellate review of the magistrate's probable-cause determination in issuing the search warrant[.]" *See State v. Crawford*, 463 S.W.3d 923, 928–29 (Tex. App.—Fort Worth 2015, pet. ref'd).

Second, the Martin parties' petition describes the City's alleged actions as intentional and wrongful, rather than as acts that fell within its lawful authority. The prayer for relief in their live petition explicitly describes the seizures as "wrongful." "[I]ntentional acts that are outside the authority of the state may be torts, but they are not takings." *City of Richardson v. Cannon*, No. 05-18-00181-CV, 2018 WL 6845240, at *3 (Tex. App.—Dallas Nov. 16, 2018, no pet.) (mem. op.) (alteration in original, internal quotation marks omitted). Texas courts have therefore held that an assertion of governmental wrongdoing affirmatively negates a takings claim. *See id.*; *Hammons*, 2005 WL 2838602, at *3.

Third, the Martin parties did not allege or present any evidence that the property was taken, damaged, or destroyed for public use. *See Self*, 690 S.W.3d at 28–29; *cf. Steele v. City of Houston*, 603 S.W.2d 786, 790–92 (Tex. 1980) (remanding for determination of whether property was destroyed for public use). "At the heart of the takings clause lies the premise that the government should not 'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004) (quoting *Steele*, 603 S.W.2d at 789). Here, the Martin parties suggested the property would have been taken for public use if the City sold it to a third party, and they presented evidence of interlocal agreements between the City and the Bexar County District Attorney's Office regarding the disposition of forfeited gambling property and proceeds.[5] However, they did not present evidence that any property seized in this dispute was disposed of under the interlocal agreement.

In post-submission briefing, the Martin parties argue that "the valid exercise of police power does not immunize a governmental body from a Takings claim." As support for this

---

[5] The interlocal agreement in our record expired on October 31, 2020, approximately five months before the Martin parties filed this lawsuit.

assertion, they rely on *Steele v. City of Houston* and *Shugart v. Thompson*. *See Steele*, 603 S.W.2d at 788; *Shugart*, No. 06-15-00101-CV, 2017 WL 117331, at *1 (Tex. App.—Texarkana Jan. 12, 2017, no pet.) (mem. op.). But in both *Steele* and *Shugart*, the plaintiffs alleged their property was taken "without due process of law," and in both cases, the plaintiffs' property was destroyed through warrantless police action. *See Steele*, 603 S.W.2d at 788–89; *Shugart*, 2017 WL 117331, at *1, *5, *7–8. Here, in contrast, it is undisputed that the property at issue was seized pursuant to a judicially approved search warrant. As a result, both *Steele* and *Shugart* are factually distinguishable.

The Martin parties' post-submission briefing represents that "[t]his Court has already held that the government is not immune from" actions for the return of seized property. The authority upon which they rely for this statement is a State's appeal from a civil forfeiture proceeding. *See State v. Forty-Five Thousand & Eight Hundred Ten Dollars and Ten Cents*, 609 S.W.3d 219, 235–36 (Tex. App.—San Antonio 2020, pet. denied). In that case, the property owner "argued the State did not follow the procedures required to initiate a forfeiture proceeding against him and, as a result, now holds funds it cannot prove it is entitled to keep." *Id.* The case did not involve a takings claim or analyze the public use element of such a claim. *See id.*

The Martin parties' post-submission briefing also cites an unpublished federal district court opinion holding that allegations arising out of the execution of an arrest warrant were sufficient to survive a jurisdictional challenge to the public use element of a takings claim. *See Chavarin v. City of El Paso*, No. EP-10-CV-0339-KC, 2011 WL 13234975, at *6–7 (W.D. Tex. Apr. 25, 2011). In *Chavarin*, the record showed that while executing an arrest warrant, "the police used full SWAT Team tactics; they shot tear gas canisters into the home, carpets were burned, holes were made in the walls, all windows were broken." *Id.* at *1. But the police in *Chavarin* were searching for a

person, not for physical evidence. *See id.* Nothing in the opinion suggested that the warrant gave the police authority to seize or destroy any property. *See generally id.* Here, as noted above, Jimmy Martin testified that all the property at issue was included within the search warrant. Additionally, the Code of Criminal Procedure specifically authorizes the seizure of "the programmable main circuit board" of a suspected gambling device or "gambling paraphernalia." *See* TEX. CODE CRIM. PROC. art. 18.095. *Chavarin* therefore lends little support to the Martin parties' position.

Finally, the underlying premise of all the Martin parties' claims, including their takings claim, is that their use and ownership of the eight-liners and other seized or destroyed property complied with section 47.01(4)(B) of the Texas Penal Code. For the reasons explained more fully below in our discussion of the Martin parties' UDJA claim, we conclude that the civil trial court lacked jurisdiction to resolve that question.

For these reasons, the Martin parties did not plead a viable takings claim, and the trial court therefore lacked jurisdiction to consider that claim. *See Hearts Bluff*, 381 S.W.3d at 491. We reverse the summary judgment order as to the takings claim and render judgment dismissing it.

*Declaratory Judgment*

A. Applicable Law

The UDJA provides:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM. CODE § 37.004(a). However, the UDJA "is not a general waiver of sovereign immunity." *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011). It "does not enlarge the trial court's jurisdiction, but is 'merely a procedural device for

deciding cases already within a court's jurisdiction.'" *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621–22 (Tex. 2011) (quoting *Sawyer Tr.*, 354 S.W.3d at 388).

Because a governmental entity is a necessary party in a direct challenge to its own statutes or ordinances, the UDJA waives immunity for claims challenging the validity of statutes or ordinances. TEX. CIV. PRAC. & REM. CODE § 37.006(b); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009). Nevertheless, both the Texas Supreme Court and this court have held that the UDJA does not waive immunity for a claim that merely "seeks a declaration of [a plaintiff's] rights under a statute or other law." *Sefzik*, 355 S.W.3d at 621; *Tex. Dep't of Ins., Div. of Workers' Comp. v. Brumfield*, No. 04-15-00473-CV, 2016 WL 2936380, at *4 (Tex. App.— San Antonio May 18, 2016, no pet.) (mem. op.).

Moreover, a civil court's authority to interpret a criminal statute is limited. "A civil court simply has no jurisdiction to render naked declarations of rights, status or other legal relationships arising under a penal statute." *State v. Morales*, 869 S.W.2d 941, 947 (Tex. 1994) (internal quotation marks omitted). A civil court may declare a criminal statute constitutionally invalid and enjoin its enforcement "only when (1) there is evidence that the statute at issue is unconstitutionally applied by a rule, policy, or other noncriminal means subject to a civil court's equity powers and irreparable injury to property or personal rights is threatened, *or* (2) the enforcement of an unconstitutional statute threatens irreparable injury to property rights." *Id.* at 942 (emphasis in original). "It is well settled that courts of equity will not interfere with the ordinary enforcement of a criminal statute unless the statute is unconstitutional and its enforcement will result in irreparable injury to vested property rights." *Passel v. Fort Worth Indep. Sch. Dist.*, 440 S.W.2d 61, 63 (Tex. 1969).

B. Application

In this case, the Martin parties asked a civil court to declare that they "are acting in accordance with Texas Penal Code § 47.01(4)(B)" and that they "are not prohibited from using or owning" their eight-liners. They also requested an order enjoining the City "from seizing [their] property or shutting down [their] businesses so long as Plaintiffs act in accordance with Texas Penal Code § 47.01(4)(B)." The Martin parties argued below and in their appellate briefing that these claims constitute an as-applied constitutional challenge to section 47.01(4)(B) of the Penal Code and thus satisfied the first prong of the *Morales* test.

We disagree. The Martin parties did not at any point challenge the validity or constitutionality of section 47.01(4)(B). *See Passel*, 440 S.W.2d at 63. To the contrary, they repeatedly described it as a valid statute. For example, in their summary judgment response, they expressly stated that they "do not challenge the constitutionality or enforceability of chapter 47." Similarly, their appellees' brief states that they "do not seek to have 47.01(4)(B) declared unconstitutional[.]"

Instead of challenging the statute, the Martin parties alleged that their eight-liners comply with the statute and that the City, Vidal, and Moynihan applied the statute incorrectly by continuing to investigate them. In other words, the Martin parties challenged the City's and the officers' interpretation of the statute, not the operation of the statute itself. This is not a proper as-applied challenge. *See Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 702 (Tex. 2014) ("[A]n as-applied challenge asserts that a statute, while generally constitutional, operates unconstitutionally as to the claimant because of her particular circumstances."); *Canal Ins. Co. v. Hopkins*, 238 S.W.3d 549, 566–67 (Tex. App.—Tyler 2007, pet. denied) (distinguishing between the constitutionality of a statute and the constitutionality of an interpretation of a statute).

Appellate courts, including this court, have held that claims like the ones asserted here did not give a civil court jurisdiction to interpret section 47.01(4)(B):

> Although Sterling insists his challenge is an attack on the constitutionality of section 47.01, his argument is nothing more than a request for an interpretation of section 47.01 and the so-called 'sweepstakes law,' and a declaration that the use of his machines . . . was not illegal under Penal Code chapter 47. Because this argument does not implicate the constitutionality of section 47.01, the first element of *Morales* has not been satisfied. . . . Because Sterling did not satisfy the *Morales* test, the trial court had no jurisdiction to enjoin the SAPD or the Bexar County District Attorney's Office from investigating or prosecuting criminal activity.

*Sterling*, 94 S.W.3d at 794–95.

> Here, plaintiffs' petition makes no constitutional attack on section 47.01(4)(B); rather, they expressly state that the [eight-liner] machines were operated 'legally' pursuant to that statute. Because one of the two *Morales* elements has not been satisfied, we hold that the civil trial court had no jurisdiction to enter any order regarding the care and disposition of the seized evidence.

*Cornyn*, 50 S.W.3d at 738 (footnote omitted).

> Our legal precedent is clear: because the statute's constitutionality is not in question, appellee's vested property rights are not in jeopardy and the applicability and validity of the criminal statute in this case can be resolved in a criminal proceeding, a court of equity is without right to intervene.

*JLM Games*, 2019 WL 5997504, at *4.

The Martin parties argue that these decisions are not binding on them because there are no criminal charges currently pending against Jimmy Martin and the previous criminal charges against him have never been fully adjudicated. Relying on the Texas Supreme Court's 1969 opinion in *Passel*—another case in which no criminal charges were pending or threatened against the plaintiffs—they argue that "a court of equity is entitled to intervene in this case" because they have no criminal venue in which to challenge the seizures. But the plaintiffs in *Passel* explicitly attacked the constitutionality of a state statute and a local school district rule implementing that statute. *Passel*, 440 S.W.2d at 63–64. The claims in *Passel* therefore presumably would have

satisfied the constitutional challenge prong of the *Morales* test.[6] *Compare id.*, *with Morales*, 869 S.W.2d at 942. Here, in contrast, the Martin parties have not asserted a constitutional challenge to section 47.01(4)(B).

On appeal, the Martin parties contend that "[t]his Court has already recognized that when there is no criminal proceeding relating to seized gambling machines, a civil trial court has authority to order return of the property." As support for this assertion, they cite *In re Gambling Devices and Proceeds*, 496 S.W.3d 159 (Tex. App.—San Antonio 2016, pet. denied). *Gambling Devices* was an appeal and alternative mandamus proceeding that the State filed to challenge orders issued in forfeiture proceedings conducted under article 18 of the Texas Code of Criminal Procedure. *See* 496 S.W.3d at 160–62; *see also* TEX. CODE CRIM. PROC. art. 18.18. Despite the Martin parties' implication to the contrary, we did not hold that "a civil trial court has authority to order return" of seized property outside of an article 18 forfeiture proceeding. The only holding in *Gambling Devices* was that we lacked jurisdiction to consider the State's appeal and that mandamus relief was not appropriate. 496 S.W.3d at 160, 164–65. Furthermore, unlike *Gambling Devices*, this case does not arise out of a forfeiture proceeding. Accordingly, *Gambling Devices* lends no support to the Martin parties' position.

After reviewing the record and the applicable law, we conclude that *Sterling*, *Cornyn*, *JLM Games*, and other similar opinions are dispositive here. Those cases establish that because the Martin parties did not challenge the constitutionality of Texas Penal Code section 47.01(4)(B), the trial court lacked jurisdiction to make any declarations or render any injunctive relief regarding either the meaning of that statute or the legality of the Martin parties' eight-liners. *See Sterling*, 94 S.W.3d at 794–95; *Cornyn*, 50 S.W.3d at 738; *JLM Games*, 2019 WL 5997504, at *4. We therefore

---

[6] *Passel* predates *Morales* and its progeny by more than two decades.

reverse the trial court's order as to the Martin parties' UDJA claims against the governmental appellants and render judgment dismissing those claims.

*Ultra Vires Claim Against Vidal and Moynihan*

A. Applicable Law

"[A]n employee sued in his official capacity has the same governmental immunity, derivatively, as his government employer, except for actions alleging that the employee acted *ultra vires*." *Cannon*, 2018 WL 6845240, at *2 (citing *Franka v. Velasquez*, 332 S.W.3d 367, 382–83 (Tex. 2011)). "Absent a statutory waiver of immunity by the Legislature," a plaintiff's claim against a governmental employee in his official capacity can proceed only if the employee's actions "were *ultra vires*—without state authority." *Hall v. McRaven*, 508 S.W.3d 232, 234 (Tex. 2017).

"*Ultra vires* claims depend on the scope of a state official's authority." *Id.* A governmental employee commits ultra vires acts if he acts without legal authority, if he fails to perform a purely ministerial act, "or if his acts conflict with the law itself." *Id.* at 238; *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). "An *ultra vires* claim based on actions taken 'without legal authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *Hall*, 508 S.W.3d at 239.

B. Application

The Martin parties have not identified any purely ministerial act that Vidal or Moynihan failed to perform. They argue only that Vidal and Moynihan acted without legal authority by: (1) continuing to obtain and execute search warrants that they allegedly knew were not supported by probable cause; (2) destroying property that they knew was not illegal; and (3) informing the

gaming rooms' landlords and vendees about the criminal investigations, which the Martin parties alleged caused them to lose contracts with the landlords and vendees.

### 1. *Warrant execution and destruction of property*

Obtaining and executing search warrants falls within a peace officer's authority. *See, e.g.*, TEX. CODE CRIM. PROC. arts. 2A.051 (peace officers have power to "execute all lawful process issued to the officer by a magistrate or court" and "give notice to an appropriate magistrate of all offenses committed in the officer's jurisdiction, where the officer has good reason to believe there has been a violation of the penal law"), 18.01(a) (search warrants in general), 18.02(a)(5) ("A search warrant may be issued to search for and seize . . . gambling devices or equipment, altered gambling equipment, or gambling paraphernalia[.]"). Furthermore, as noted above, the Code of Criminal Procedure provides that "an officer directed under a search warrant to search for and seize a gambling device or equipment, altered gambling equipment, or gambling paraphernalia" may, in the officer's discretion, "seize only the programmable main circuit board of the device" and "carry the circuit board before the magistrate[.]" *Id.* art. 18.095. Stated differently, the Code of Criminal Procedure gives an officer discretion to remove the circuit board from equipment he suspects is a gambling device or gambling paraphernalia. *See id.*

Nevertheless, the Martin parties' summary judgment response argued that Vidal and Moynihan went beyond their authority:

> by continuing with their investigations, even after learning of exculpatory evidence demonstrating Mr. Martin's compliance with chapter 47. . . . Det. Vidal and Det. Moynihan were aware of evidence that placed Mr. Martin squarely outside the Texas bounds of their authority to prosecute gambling violations. . . . Det. Vidal and Det. Moynihan did not care what the actual Texas gambling laws allowed, and instead allowed their own personal beliefs to govern their investigation.

These claims do not allege that Vidal and Moynihan misinterpreted their authority to execute search warrants. Instead, they allege that Vidal and Moynihan misinterpreted the gambling laws the officers sought to investigate.

When an ultra vires claim is based on a governmental official's purported misinterpretation of the law, the dispositive question is whether the law is: (1) collateral to the official's authority, in which case an ultra vires claim will not lie; or (2) an "*enabling law*" that defines "the bounds of [the official's] own authority," a misapplication of which could potentially support an ultra vires claim. *Compare Hall*, 508 S.W.3d at 241–42 (emphasis in original), *with Hous. Belt*, 487 S.W.3d at 158, 165.

In *Houston Belt*, the Texas Supreme Court considered a case where a city's ordinance identified "the specific types of data" a government employee could use to determine drainage fees for the plaintiffs' property. *Hous. Belt*, 487 S.W.3d at 168–69. The evidence showed that the employee used data other than that listed in the ordinance to determine the fees assessed against the plaintiffs, and the plaintiffs alleged he acted ultra vires by doing so. *Id.* The supreme court concluded the ordinance imposed "explicit constraints" on the employee's decision-making such that his "discretion was limited in *how* he reached a conclusion." *See Hall*, 508 S.W.3d at 242 (discussing *Houston Belt*, emphasis in original). Because the court concluded that the employee misinterpreted the boundaries of his own authority, it allowed the plaintiffs' ultra vires claim to proceed. *See Hous. Belt*, 487 S.W.3d at 169; *Hall*, 508 S.W.3d at 241–42.

In *Hall*, however, the court concluded the ultra vires suit was barred because the relevant statutes tasked the government employee "with making a determination" but left his discretion to make that determination "otherwise unconstrained." *Hall*, 508 S.W.3d at 242. The statutes the employee purportedly misinterpreted in *Hall* were "not of his organic authority" but were instead

"collateral to [his] authority"—*i.e.*, it fell within his discretion to interpret those statutes. *Id.* "When the ultimate and unrestrained objective of an official's duty is to interpret collateral law, a misinterpretation is not overstepping such authority; it is a compliant action even if ultimately erroneous." *Id.*

This situation is more like *Hall* than *Houston Belt*. Here, the enabling statutes are those that establish a peace officer's authority to obtain and execute search warrants. *See* TEX. CODE CRIM. PROC. arts. 2A.051, 18.01(a), 18.095. The statute Vidal and Moynihan purportedly misinterpreted, section 47.01(4) of the Penal Code, does not define their authority to execute search warrants or place any express constraints on that authority. *Cf. Hous. Belt*, 487 S.W.3d at 163, 168–69; *compare* TEX. PENAL CODE § 47.01(4), *with* TEX. CODE CRIM. PROC. arts. 2A.051(4), 18.02(a)(5). As a result, section 47.01(4) is "collateral" to the officers' authority, such that its misinterpretation will not support an ultra vires claim. *See Hall*, 508 S.W.3d at 242–43.

The Martin parties have argued that Vidal and Moynihan "disregarded the law" by continuing to obtain and execute search warrants. Once again, however, it is undisputed that each warrant at issue here was issued by a magistrate upon a finding of probable cause. *See* TEX. CODE CRIM. PROC. art. 18.01(b), (c). The Martin parties' arguments on this point thus necessarily ask a civil court to go behind the face of unchallenged warrants and make a *post hoc* determination that those warrants were not validly issued. For the reasons described above in our discussion of the UDJA claims, the applicable authority establishes as a matter of law that a civil court lacks authority to do so under these circumstances. *See Morales*, 869 S.W.2d at 942; *Sterling*, 94 S.W.3d at 794–95; *cf. Hardy*, 102 S.W.3d at 130 (concluding, in a civil-forfeiture case, that "[o]nce the State satisfied the magistrate that it had probable cause for the warrant, the State's burden [to support a forfeiture of suspected gambling devices] was met").

### 2. Officers' communications to third parties

The Martin parties also alleged that Vidal's and Moynihan's actions caused the Martin parties to lose contracts with landlords and vendees. This claim is based on phone calls and emails Vidal and Moynihan made to those third parties about the criminal investigations, and the Martin parties presented evidence of those communications. The governmental appellants have never offered any investigatory reason for Vidal and Moynihan to contact the Martin parties' landlords and vendees, and they did not cite any authority establishing that such actions fall within a peace officer's discretion.

The governmental appellants argued, however, that "ultra vires claimants are only entitled to prospective relief. . . . If the injury has already occurred and the only plausible remedy is monetary damages, an ultra vires claim will not lie." *City of Houston v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018); *Heinrich*, 284 S.W.3d at 374. "It is well settled that 'private parties cannot circumvent the State's sovereign immunity from suit by characterizing a suit for money damages . . . as a declaratory-judgment claim.'" *Heinrich*, 284 S.W.3d at 371 (quoting *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 856 (Tex. 2002)).

The Martin parties' petition purported to seek prospective relief. For example, they sought an order that enjoined Vidal and Moynihan "from interfering with Plaintiffs' businesses[.]" However, in conjunction with that request, they sought a declaration that Vidal and Moynihan had "acted outside the scope and authority of their offices" in the past and that those past actions "have interfered with Plaintiffs' businesses and contracts related thereto[.]" They also asked the trial court to "impose[] on Defendants mandatory compliance with" the fuzzy-animal exclusion and sought an order enjoining the governmental appellants "from seizing Plaintiffs' property or

shutting down Plaintiffs' businesses so long as Plaintiffs act in accordance with Texas Penal Code § 47.01(4)(B)."

In their motion for summary judgment, the governmental appellants argued that the Martin parties' ultra vires claim was "necessarily seeking to remedy *past* harms," that the elements of the tortious interference action underlying the ultra vires claim "pertain to acts that have already transpired," and that "there is no prospective relief available in the context of Plaintiffs' claim for tortious interference." The Martin parties did not address this argument in either their summary judgment response or their appellees' brief.

We agree with the governmental appellants. The ultra vires claim is based on an allegation of tortious interference with contract, and the Martin parties' petition and summary judgment responses establish that the alleged interferences occurred in the past. *See City of Houston v. Williams*, 216 S.W.3d 827, 829 (Tex. 2007) (per curiam) ("The only injury the retired firefighters allege has already occurred, leaving them with only one plausible remedy—an award of money damages."). While the Martin parties' petition alleged that Vidal and Moynihan will continue to target them in the future, the only prospective relief they sought to remedy that potential future claim would require the trial court to: (1) conclude that Vidal and Moynihan did not follow section 47.01(4)(B) in the past; and (2) order them to do so in the future. As explained above, we have already concluded that under the facts of this case, a civil court lacks jurisdiction to interpret that penal statute or to enjoin the officers' actions under it.

In short, the Martin parties' pleadings seek relief for past harms that are not remediable through an ultra vires claim. The pleadings therefore affirmatively negate the Martin parties' ultra vires claim, and the trial court erred by denying the governmental appellants' motion for summary

judgment on it. *See Meyers*, 548 S.W.3d at 486. We reverse the trial court's order and render judgment dismissing the ultra vires claim.

## CONCLUSION

The City, Vidal, and Moynihan established as a matter of law that they are immune from the Martin parties' takings, UDJA, and ultra vires claims. Accordingly, we reverse the trial court's order denying the motion for summary judgment and render judgment dismissing the Martin parties' lawsuit against the City, Vidal, and Moynihan.

Lori I. Valenzuela, Justice